# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ELIZABETH HARRIS,                                    Case No. 1:19-cv-055
      Plaintiff,                                 Litkovitz, M.J.

      vs.

COMMISSIONER OF                                      **ORDER**
SOCIAL SECURITY,
      Defendant.

      Plaintiff Elizabeth Harris brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB"). This matter is before the Court on plaintiff's Statement of Errors (Doc. 11) and the Commissioner's response in opposition (Doc. 17).

## I. Procedural Background

      Plaintiff filed her application for DIB in May 2015, alleging disability since April 23, 2015, due to asthma, attention deficit hyperactivity disorder ("ADHD"), anxiety, depression, chronic neck pain, history of cervical cancer, thoracic outlet syndrome, chronic diarrhea, subclavian vein stenosis left, ligation of saphenous vein, and left meniscal tear. The application was denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing before administrative law judge ("ALJ") Thuy-Anh Nguyen on October 3, 2017. Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ hearing. On May 23, 2018, the ALJ issued a decision denying plaintiff's DIB application. This

decision became the final decision of the Commissioner when the Appeals Council denied review on November 26, 2018.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2019.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since April 23, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: fibromyalgia, inflammatory bowel disease (IBD), degenerative disc disease of the lumbar spine status post remote lumbar spine surgery, asthma, subclavian stenosis in the left upper extremity, affective disorder, and anxiety disorder (20 CFR 404.1520(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).
>
> 5. After careful consideration of the entire record, [the ALJ] finds that the [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the [plaintiff] is limited to occasional climbing of ramps and stairs; no climbing of ladders, ropes, and stairs; occasional balancing,

kneeling, stooping, crouching, and crawling; frequent handling, fingering, and feeling with the non-dominant left upper extremity; must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; and must avoid all exposure to hazards, including unprotected heights. The [plaintiff] retains the ability to understand, remember, and carry out simple, routine tasks and is limited to no high pace or high production requirements. The [plaintiff] can interact occasionally with the public, coworkers, and supervisors and is limited to low stress jobs defined as jobs having occasional changes in the work setting with changes that can be explained in advance and involving occasional decision-making.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).[1]

7. The [plaintiff] was born [in] . . . 1970 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569 and 404.1569(a)).[2]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from April 23, 2015, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 16-27).

---

[1]Plaintiff's past relevant work was as an office manager and accounting clerk, both sedentary, skilled positions, and an admissions coordinator, sedentary as generally performed and light as actually performed, a semi-skilled position. (Tr. 25, 70).

[2]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light, unskilled occupations such as routing clerk (80,000 jobs in the national economy), marking clerk (300,000 jobs in the national economy), and inspector (100,000 jobs in the national economy). (Tr. 26, 72-74).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545–46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Relevant Medical Evidence and Opinions

#### 1. Physical Impairments

##### a. *Dr. Michael Bernardon, M.D.*

Plaintiff saw her primary care physician, Dr. Bernardon on April 24, 2015 for follow-up of her anxiety disorder and persistent chest pain with thoracic outlet syndrome. (Tr. 297). Her physical and mental examinations were normal. (Tr. 298). Due to neck pain and right upper extremity pain and numbness, plaintiff underwent an EMG/NCS on May 1, 2015, which was normal and showed no evidence of neuropathy involving the right upper extremity. (Tr. 291-92).

On February 10, 2016, plaintiff complained of upper respiratory infection symptoms for the past seven weeks. She also stated that she has Wegener's disease.[3] (Tr. 2687). Dr. Bernardon assessed acute bronchitis and upper respiratory infection, Wegener's granulomatosis, chronic pain syndrome, and vitamin B12 deficiency. As to her Wegener's granulomatosis, plaintiff was to follow a treatment plan per rheumatology with Methotrexate or Prednisone. (Tr. 2690).

Dr. Bernardon referred plaintiff for a functional capacity evaluation, which was completed on July 26, 2017 by physical therapist Sandy Crothers "for her social security disability benefits determination." (Tr. 2776). Ms. Crothers found that plaintiff was limited to no lifting over 10 pounds, with seldom standing or walking. Plaintiff was also found to have the

---

[3]"Granulomatosis with polyangiitis is an uncommon disorder that causes inflammation of the blood vessels in your nose, sinuses, throat, lungs and kidneys. Formerly called Wegener's granulomatosis, this condition is one of a group of blood vessel disorders called vasculitis. It slows blood flow to some of your organs. The affected tissues can develop areas of inflammation called granulomas, which can affect how these organs work." *See* https://www.mayoclinic.org/diseases-conditions/granulomatosis-with-polyangiitis/symptoms-causes/syc-20351088 (last visited March 9, 2020).

ability to bilaterally finger, handle, or high reach only occasionally. Ms. Crothers found that plaintiff was cooperative and provided good effort with the evaluation. Plaintiff was functioning at a sedentary level for her material handling work abilities. She should have permanent restrictions consisting of sitting only for any type of employment due to the pathology and pain in her left foot. Plaintiff also reported problems with neck and back pain limiting her functional mobility. Overall, plaintiff was extremely deconditioned due to the extended period of time (more than two years) that she had been totally sedentary, spending the majority of most days in bed. It was recommended that she participate in an appropriate physical therapy program to improve her overall activity tolerance and improve her function for all activities of daily living. Ms. Crothers also believed that plaintiff would benefit from speech or occupational therapy for cognitive re-training. (Tr. 2775-86). In Dr. Bernardon's September 1, 2017 opinion, he adopted these limitations and opined that plaintiff would be absent from work four or more days per month. (Tr. 2769-74).

    b.  *Cleveland Clinic*

    Plaintiff underwent a TVT (tension-free vaginal tape) sling in 2013 for stress urinary incontinence (SUI). She consulted with a urologist, Dr. Marisa Clifton, M.D., on November 17, 2015. Plaintiff reported chronic suprapubic itching and pelvic pain since the surgery, and the left suprapubic incision site had been opened on multiple occasions. (Tr. 2489). Dr. Clifton recommended surgical removal of the sling but advised that the stress urinary incontinence would likely return. (Tr. 2491). Plaintiff underwent surgical excision of the sling on July 13, 2016 with Dr. Sandip Vasavada, M.D. (Tr. 2662-64). When plaintiff saw Dr. Vasavada on

August 30, 2016, she reported frustration surrounding her urge urinary incontinence requiring her to wear pads.  She stated that she was having frequent urgency and was unable to make it to the bathroom multiple times daily.  Plaintiff further complained of frequent nocturia, numbness across the pubic area since surgery, intermittent dysuria, and cramping/pelvic pressure.  (Tr. 2645).  On examination, she showed no acute distress, she exhibited normal extremities with no edema, and her incision area was well-healed.  (Tr. 2647).  Dr. Vasavada started plaintiff on a trial of overactive bladder medication and advised plaintiff to follow up in four months' time. (Tr. 2647-48).

Plaintiff was seen by a rheumatologist, Dr. Alexandra Villa Forte, M.D., for evaluation of probable Granulomatosis with polyangiitis ("GPA") on February 16, 2016.  Plaintiff complained that she continued to have significant sinus symptoms including severe congestion, drainage, mucous, cough, nasal crusting, difficulty sleeping, clear rhinorrhea, and intermittent productive cough.  (Tr. 2571).  Dr. Villa Forte found that plaintiff had unremitting sinus, nose, and ear symptoms without any response to multiple courses of antibiotics.  She noted recurrent left otitis media with effusion causing a left ear Tympanic Membrane rupture.  Dr. Villa Forte further stated that a remote pathology report from an outside hospital showed chronic sinusitis with granulomas, but the slides had been destroyed.  Dr. Villa Forte concluded, "It is difficult to establish the diagnosis of GPA with complete certainty but her persistent ear, nose and sinus symptoms + path report with granulomatous inflammation and neg cultures are suggestive of GPA."  (Tr. 2574).  Dr. Villa Forte started plaintiff on Prednisone and Methotrexate.  (Tr. 2575).

When seen by Dr. Villa Forte in August 2016, plaintiff reported that she had not had any nose, sinus or ear problems since she started the methotrexate. (Tr. 2621-22). Dr. Villa Forte assessed that plaintiff's probable limited GPA responded to methotrexate and "appears to be in remission." (Tr. 2624).

c. *Beacon Orthopedics*

Plaintiff consulted with orthopedic surgeon Dr. Lisa Vickers, M.D., on referral from Dr. Bernardon in August 2016. (Tr. 2808-13). Plaintiff reported she injured her right ankle with a fall down the stairs some five months prior, which resulted in pain, swelling and bruising in the lateral aspect of the ankle. She reported it took quite some time for the swelling and bruising to resolve. Since that time, she had persistent pain in the lateral ankle. She experienced stiffness in the mornings and after periods of inactivity. She previously had experienced pain and tenderness in the Achilles tendon. She had treated this on her own with shoe wear modification and activity modification. She reported that since back surgery in 2004, her lifestyle had completely changed and become more sedentary. (Tr. 2808). On examination, plaintiff exhibited no swelling, erythema, warmth, ecchymosis, or edema of her right ankle. Standing showed normal alignment. Inspection of the Achilles tendon revealed nodular swelling and tenderness to palpation. There was no erythema or warmth. There was tenderness over the anterior talofibular ligament and calcaneofibular ligament and the lateral ankle. Plaintiff also exhibited some tenderness in the peroneal tendon sheath without significant effusion. Plaintiff's range of motion was not limited, but she had some pain with range of motion. There was some subluxation of the peroneal tendons with circumduction of the ankle. There was no ligament instability. X-rays showed no

acute bony abnormality.  Dr. Vickers assessed Achilles tendinitis of the right lower extremity; right ankle sprain, unspecified ligament, initial encounter; and peroneal tendinitis of the right lower extremity.  Dr. Vickers recommended immobilization in a removable cast boot for the next four weeks.  (Tr. 2812).

When seen for her four-week follow-up, plaintiff stated she was not wearing her boot at home because she felt unsteady going up and down stairs, and she admitted that she had tripped and fallen on her stairs a couple of times.  (Tr. 2799).  She admitted her ankle felt better when she wore the boot.  On examination, plaintiff exhibited some tenderness in her right ankle, but no distress; her gait was normal and ambulatory; her reflexes, distal capillary and distal pulses were normal; and she had no swelling or edema in her right ankle.  (Tr. 2802).  Dr. Vickers recommended continued use of the walking boot in order to prevent reinjury and referred plaintiff to physical therapy.  (Tr. 2803).

On February 16, 2017, plaintiff consulted with Dr. Adam Miller, M.D., for evaluation of left foot pain.  She reported previous treatment with injections and a carbon fiber footplate with no improvement.  Examination of the left foot showed pain with mid-range and end range of motion in the great toe and dorsal tenderness greater than plantar tenderness.  Plaintiff exhibited an antalgic gait.  An x-ray demonstrated large dorsal bone spurs along the metatarsal head and base of the proximal phalanx with Grade III hallux rigidus along the lateral compartment of the great toe.  Dr. Miller recommended surgical correction of the left-sided hallux rigidus with cheilectomy (removal of excess bone from big toe joint).  (Tr. 2793-94).

Dr. Miller performed a first metatarsal phalangeal joint cheilectomy, proximal phalanx osteotomy, and first metatarsal phalangeal joint interpositional arthroplasty on February 27, 2017. (Tr. 2797-98). By April 2017, six weeks post-op, plaintiff had no complaints and her incision was healed. Dr. Miller noted plaintiff had active and passive range of motion now to 40 degrees and walked with a non-antalgic gait. (Tr. 2790).

When seen for follow-up on September 7, 2017, plaintiff was continuing to have pain in her left great toe six months out from surgery. Dr. Miller found minimal swelling in the left great toe with tenderness in the metacarpophalangeal ("MP") joint. An x-ray of the left foot demonstrated cystic change in the metatarsal head with partial collapse suggestive of avascular necrosis with arthrosis at the MP joint. Dr. Miller stated that there was a significant change in the metatarsal head compared to x-rays taken in July and recommended plaintiff undergo fusion surgery. He advised plaintiff that waiting any longer to perform the surgery may result in less bone to deal with. (Tr. 2815).

2. Mental Impairments

a. *Professional Psychiatric Services*

The first treatment note from Professional Psychiatric Services is dated May 18, 2015 with Sharon Cooper, MSN. There is no initial intake form or initial psychiatric form contained in the record. On this date, plaintiff was taking Adderall and Sertraline. She reported mood instability and fatigue following a hysterectomy but did not take hormone replacement medication. Plaintiff was very tearful during the interview. (Tr. 2768). The progress notes

show plaintiff was seen for psychotherapy and medication management until at least September 2017. (Tr. 2459-62, 2734-68).

Dr. Tyra Ripley, Psy.D., completed a medical assessment in June 2017. Dr. Ripley reported that she treated plaintiff with psychotherapy to address pain management, bi-polar, depression, anxiety, and ADHD. (Tr. 2817). Dr. Ripley opined that plaintiff has poor ability to deal with work stresses, maintain attention/concentration, understand, remember and carry out complex or detailed job instructions, and relate predictably in social situations. (Tr. 2818-19). Dr. Ripley believed that plaintiff would be off task 75 to 100% of the workday and would miss work four or more days per month. (Tr. 2820-21). A psychiatrist, Dr. Jemila Raji, M.D., signed off on this assessment on September 28, 2017. (Tr. 2821).

### b.    Dr. Andrea Johnson, Psy.D., consultative examiner

Dr. Johnson evaluated plaintiff for disability purposes on September 15, 2015. (Tr. 2464-70). Plaintiff was applying for disability due to anxiety. (Tr. 2464). She socialized with her husband and her best friend. She also reported some history of interpersonal problems with supervisors and coworkers. She had completed her college degree. (Tr. 2465). She endorsed depression symptoms of persistent low mood, irritability, and tearfulness. She reported a history of some mental health treatment and had been formally diagnosed with ADHD and depression. (Tr. 2466). Dr. Johnson noted that during the current evaluation, plaintiff demonstrated no motor manifestations of anxiety. She denied symptoms of posttraumatic stress disorder, denied symptoms of agoraphobia, and denied symptoms of panic disorder. She appeared to be of average intelligence. Dr. Johnson assessed Major Depressive Disorder, Recurrent Episode,

Moderate, and Unspecified Attention-Deficit/Hyperactivity Disorder. (Tr. 2468). Dr. Johnson opined that plaintiff was "likely to have significant difficulties with job related tasks due to mental health problems" and was "somewhat able to understand and follow directions in the present evaluation and performed average on memory/recall tasks." (Tr. 2469). Dr. Johnson found that plaintiff was "likely to show a pattern of time away from work for mental health reasons" and was only fleetingly able to concentrate on questions and tasks throughout the evaluation leading to the conclusion that she may work at a pace slower than that of her work peers. (*Id.*). In addition, Dr. Johnson stated that plaintiff's interaction with her during the evaluation was only marginally adequate, and there was a reported history of interpersonal problems with supervisors and coworkers. She opined that plaintiff would be only somewhat likely to respond appropriately to coworkers in a work setting, with her irritability and low mood likely negatively impacting those relationships. Additionally, Dr. Johnson felt that plaintiff was only somewhat able to respond appropriately to work stressors and situations, based upon plaintiff's tendency to become easily overwhelmed and act impulsively. (Tr. 2469).

E.      **Specific Errors**

On appeal, plaintiff alleges that ALJ Nguyen erred in failing to identify all of her severe impairments. Plaintiff also argues that the ALJ erred in assigning only little weight to the opinion of her treating primary care physician, Dr. Bernardon, regarding her physical limitations, and to the opinion of her treating psychiatrist and psychologist, Drs. Raji and Ripley, as to her psychological limitations. (Doc. 11).

## 1. Severe impairments

Plaintiff contends the ALJ erred by failing to find that her granulomatosis, left foot problem, and urinary incontinence were severe impairments. Plaintiff alleges the ALJ did not mention her diagnosis of granulomatosis, nor did she properly consider plaintiff's left foot impairment and long-standing urinary incontinence issues. Plaintiff contends that her symptoms from these impairments support the limitations assessed by Dr. Bernardon, her treating primary care physician.

Although the ALJ did not conclude that plaintiff's granulomatosis, left foot problems, and urinary incontinence were severe impairments, the ALJ found that plaintiff suffered from numerous other severe physical and mental impairments. Once an ALJ finds that a claimant has at least one severe impairment at step two of the disability analysis, the ALJ must then "consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe" in evaluating the claimant's ability to work at step four. 20 C.F.R. § 404.1545(e). That is what the ALJ did here. Thus, whether the ALJ characterized plaintiff's granulomatosis, left foot problem, and urinary incontinence as severe or non-severe at step two is "legally irrelevant" and does not amount to legal error. *Emard v. Comm'r of Soc. Sec.*, No. 19-1591, __ F.3d __, 2020 WL 1295047, at *6 (6th Cir. Mar. 19, 2020) (quoting *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008)).

In any event, the ALJ appropriately considered plaintiff's complaints of urinary incontinence that reportedly resulted from cervical cancer treatment. (Tr. 20-21). The ALJ thoroughly discussed the medical evidence of plaintiff's TVT sling placement and subsequent

removal, as well as the examination findings related to plaintiff's complaints of pelvic pain. (Tr. 21, citing Tr. 2725-26, 2590-2593, 2647-2648). In August 2016, following the sling removal, plaintiff was treated with bladder medication by Dr. Vasavada, who advised plaintiff to follow up in four months' time. (Tr. 2647-48). The record does not indicate whether plaintiff followed through with this appointment. Plaintiff has failed to identify any medical opinion indicating that this impairment resulted in any additional specific work-related limitations that the ALJ should have included in the RFC. Therefore, the Court finds no error in the ALJ's consideration of this impairment.

Similarly, the ALJ discussed plaintiff's left foot problem that began in February 2017. Plaintiff underwent left foot surgery that same month. During a post-surgical follow-up in April 2017, Dr. Miller reported the incision was well-healed, and plaintiff exhibited normal walking with no antalgic gait. (Tr. 22). However, the ALJ did not mention Dr. Miller's next orthopedic note from September 2017, recommending fusion surgery of plaintiff's left big toe.

The ALJ's failure to cite to Dr. Miller's September 2017 treatment note, which indicated plaintiff may need additional surgery for her left toe impairment, is harmless error. Plaintiff bears the burden of showing that her left toe condition is a severe impairment that meets the twelve-month duration requirement. *See Her v. Comm'r*, 203 F.3d 388, 391 (6th Cir. 1999); *Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir. 1988). "To meet this burden, [s]he must show that [s]he has an impairment that has lasted or is expected to last for a continuous period of at least twelve months and that h[er] impairment has significantly limited h[er] ability to do basic work activities." *Harley v. Comm'r of Soc. Sec.*, 485 F. App'x 802, 803 (6th Cir. 2012) (citing 20

C.F.R. §§ 404.1509, 404.1521, 416.909, 416.921). Plaintiff has not presented any evidence indicating that her left toe impairment, which began in February 2017, has lasted or is expected to last for a continuous period of at least 12 months. In the absence of any such evidence, the ALJ's failure to cite Dr. Miller's September 2017 treatment note is harmless error.

The Commissioner acknowledges the ALJ did not mention plaintiff's diagnosis of granulomatosis in her decision. Nevertheless, plaintiff has failed to show how the ALJ's failure to identify granulomatosis as a severe impairment constitutes reversible error. Plaintiff was diagnosed with this impairment in February 2016 and was ultimately treated by Dr. Villa Forte with Prednisone and Methotrexate. (Tr. 2575). On a follow-up exam with Dr. Villa Forte in August 2016, plaintiff reported she had not had any nose, sinus or ear problems since she started the Methotrexate (Tr. 2621-22), and Dr. Villa Forte concluded that plaintiff's "probable" limited granulomatosis "appears to be in remission." (Tr. 2624). Plaintiff has not identified any medical evidence showing this impairment lasted for the requisite duration of 12 months or imposed greater limitations than those assessed by the ALJ.

Plaintiff's first assignment of error is overruled.

## 2. Weight to treating physician Dr. Bernardon

Plaintiff alleges the ALJ failed to give good reasons for giving little weight to the assessment of treating physician Dr. Bernardon, who opined that plaintiff was limited to sedentary work and would likely be absent from work four or more days per month. Plaintiff alleges the ALJ gave little weight to Dr. Bernardon's opinion without any real discussion of how his assessment was inconsistent with or not supported by the record. (Doc. 11 at 8). She

contends that Dr. Bernardon's assessment is supported by the functional capacity evaluation upon which it is based, and the ALJ "did not address the fact that this functional capacity evaluation was performed or discuss its findings." (*Id*.).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. Under the treating physician rule, "greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. . . ." *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544. The rationale for the rule is that treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." *Rogers*, 486 F.3d at 242. A treating source's medical opinion must be given controlling weight if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 404.1527(c)(2); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). If a treating source's medical opinion is not entitled to controlling weight, the ALJ must apply the following factors in determining what weight to give the opinion: the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson*, 378 F.3d at 544.

The ALJ gave little weight to Dr. Bernardon's assessment that plaintiff was likely to miss four days or more per month from her impairments or treatment; that plaintiff was limited to

sedentary exertion; and that plaintiff had additional postural and manipulative limitations. (Tr. 24, citing Tr. 2769-2786). While the ALJ did not explicitly cite to the findings in the FCE, she implicitly acknowledged that Dr. Bernardon's opinion was based on the FCE findings. The ALJ stated that Dr. Bernardon's opinion included limitations for sedentary work and other postural and manipulative limitations, which were specific restrictions found only in the FCE. The ALJ then weighed Dr. Bernardon's opinion in accordance with the regulations and gave good reasons for her decision.

The ALJ considered whether Dr. Bernardon's opinion was consistent with the overall record. *See* 20 C.F.R. § 404.1527(b), (c)(4). (Tr. 24). The ALJ determined that Dr. Bernardon's opinion was inconsistent with both the physical examination findings and plaintiff's daily activities and therefore entitled to little weight. The ALJ cited to examination findings that showed some instances of tenderness but mostly showed no edema, a normal gait, and normal strength. (*See, e.g.*, Tr. 306, 1916-17, 2025, 2202, 2557-58, 2593, 2647, 2673-74, 2698, 2790, 2802). As the ALJ reasonably noted, plaintiff's physical examinations had generally been within acceptable limits. (Tr. 24, citing Tr. 306, 1916-17, 2025, 2200-02, 2553-58, 2590-93, 2647, 2662, 2671-74, 2696-98, 2724-26, 2730, 2790, 2799-2804). Plaintiff has failed to address the ALJ's reasoning in this regard, nor has she cited to the Court any contrary objective or clinical findings that support Dr. Bernardon's opinion, aside from referencing the FCE.

In addition, the ALJ reasonably determined that plaintiff's daily activities were inconsistent with Dr. Bernardon's more extreme limitations. Plaintiff's daily living activies included taking care of her two cats and minor child, driving her son to and from school,

preparing meals, performing some yardwork, cleaning, washing laundry, shopping in stores and by computer, attending some of her son's sporting events, and attending doctor's appointments. (Tr. 24, citing Tr. 228-31, 249-51, 2467). Again, plaintiff has failed to address or contest the ALJ's finding in this regard. The ALJ reasonably found the evidence of plaintiff's ability to perform these activities and to engage in physical activities that involved walking, lifting and bending to be inconsistent with the debilitating limitations assessed by Dr. Bernardon. An ALJ need not give great weight to a treating physician's opinion that is inconsistent with a claimant's daily activities. *See Miller v. Comm'r of Soc. Sec.*, 524 F. App'x 191, 194 (6th Cir. 2013) (citing the ability "to engage in significant daily activities" as a factor the ALJ appropriately considered in weighing treating physician's opinion); *Ellis v. Comm'r of Soc. Sec.*, 59 F. App'x 114, 115-16 (6th Cir. 2003) (same).

The ALJ reasonably determined that plaintiff's physical examination findings and activities of daily living were inconsistent with Dr. Bernardon's opinion. Even where substantial evidence would support a different conclusion or where a reviewing court would have decided the matter differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See Her*, 203 F.3d at 389. Here, the ALJ thoroughly reviewed the evidence of record (Tr. 21-23) and gave specific and valid reasons for assigning little weight to Dr. Bernardon's opinion. The ALJ's decision to give little weight to the opinion of Dr. Bernardon is supported by substantial evidence.

### 3. Weight to treating psychiatrist Dr. Raji and psychologist Dr. Ripley

Plaintiff contends the ALJ erred in giving little weight to the opinion of Drs. Raji and Ripley, who treated plaintiff at Professional Psychiatric Services for bipolar depression, anxiety, ADHD, and chronic pain management. Both Drs. Raji and Ripley signed a medical assessment of ability to do work related activities (mental) in which they opined that plaintiff had a poor ability to deal with work stresses, maintain attention/concentration, understand, remember and carry out complex or detailed job instructions, and relate predictably in social situations. (Tr. 2818-2819). Additionally, Drs. Raji and Ripley stated that plaintiff would be off task 75-100% of the workday and would be expected to miss work four or more work days per month as a result of her impairments or treatment. (Tr. 2820-2821). Plaintiff contends that she had been treated for over two years at Professional Psychiatric Services, and her regular psychotherapy and medication management, with frequent medication adjustments, are consistent with ongoing, symptomatic mental health difficulties. (Doc. 11 at 10, citing Exs. 29F, 33F, 40F, 45F). Plaintiff contends Drs. Raji and Ripley's opinion is entitled to controlling weight, and the ALJ erred by failing to provide good reasons to discount this opinion.

Plaintiff further alleges that the opinion of the one-time consultative examiner, Andrea Johnson, Psy.D., is consistent with that of Drs. Raji and Ripley. Dr. Johnson opined that plaintiff "would likely exhibit a pattern of periods of time away from work due to her mental health symptoms." She was only fleetingly able to concentrate on questions and tasks throughout the evaluation, which led Dr. Johnson to conclude that plaintiff may work slower than her work peers. Dr. Johnson opined that plaintiff would only be somewhat likely to respond appropriately

to coworkers in a work setting because her irritability and low mood would likely impact those relationships negatively. Dr. Johnson also opined that plaintiff was only somewhat able to respond appropriately to work stressors and situations based upon her tendency to become easily overwhelmed and impulsive. (Tr. 2463-2471).

The ALJ gave little weight to the opinions of Drs. Raji, Ripley, and Johnson, finding that their opinions were inconsistent with the overall record evidence. The ALJ determined that these opinions were not consistent with plaintiff's mental status examinations, which were generally within acceptable limits with conservative treatment. (Tr. 24). The ALJ also found that despite her mental health impairments, plaintiff was able to engage in numerous activities of daily living, which undermined the more extreme opinions of these doctors. (*Id*.).

The ALJ's decision to give little weight to these opinions is supported by substantial evidence. The ALJ considered whether these opinions were "well-supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(c)(2). In the psychiatric context, objective medical evidence consists of laboratory findings and medical signs, 20 C.F.R. § 404.1512(b), which are defined as "psychological abnormalities which can be observed, apart from your statements (symptoms)" and which "must be shown by medically acceptable clinical diagnostic techniques." 20 C.F.R. § 404.1528(b).[4] "[S]igns are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception," which must "be shown by observable facts that can be medically described and evaluated." *Id*. "Any record

_____

[4] Sections 404.1512(b) and 404.1528(b) were modified effective March 17, 2017. The prior regulations were in effect when the ALJ issued her decision in this case and apply here.

opinion, even that of a treating source, may be rejected by the ALJ when the source's opinion is not well supported by medical diagnostics or if it is inconsistent with the record." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012).

The ALJ reasonably concluded that the opinions of Drs. Raji, Ripley, and Johnson were inconsistent with the mental health evidence of record, including plaintiff's mental status examinations, which showed that plaintiff generally functioned within normal limits. The ALJ noted the examinations by plaintiff's primary care physician, Dr. Bernardon, and the Cleveland Clinic physicians, whose evaluations of plaintiff's psychiatric status were generally within acceptable limits. (Tr. 24, citing (Tr. 306) 1/15: Dr. Bernardon-Psychiatric: normal mood and affect; behavior is normal; judgment and thought content normal; (Tr. 2029-2013) 3/15: Dr. Bernardon-Psychiatric: normal mood and affect; behavior normal; (Tr. 2024) 4/15: Dr. Bernardon- Psychiatric: normal mood and affect; behavior is normal; judgment and thought content normal; (Tr. 2557) 1/16: Cleveland Clinic-mental status: oriented to person, place, and time; displays appropriate mood and affect; (Tr. 2585) 2/16: Cleveland Clinic-mental status: fully cooperative; eye contact good; affect depressed; speech normal in rate, volume, articulation; thoughts logical; somatic preoccupation marked; judgment and insight fair; attention span and concentration normal; (Tr. 2647) 8/16: Cleveland Clinic-no signs of depression, anxiety, agitation).

The ALJ further noted that plaintiff's mental status examinations during her treatment at Professional Psychiatric Services were largely normal, with few exceptions. (Tr. 24). When plaintiff was initially assessed at Professional Psychiatric Services on May 18, 2015, her mental

status examination showed her insight and judgment were fair, grooming was appropriate, thought content was appropriate, speech was clear and coherent, thought processes were intact, and cognition was clear. (Tr. 2768). In early July 2015, plaintiff displayed a sad and anxious mood (Tr. 2765), but later that month her mental status exam showed she was adequately groomed, euthymic, and goal directed; her affect was congruent; and her behavior was attentive. (Tr. 2764). The following month, her doctor noted there had been no change since the last visit. (Tr. 2763). In September 2015, plaintiff's mental status exam was noted to be "within normal limits," and her mood was euthymic. (Tr. 2762). In October 2015, plaintiff was sad, irritable, anxious, and animated with some depressive features. (Tr. 2758-59). Later that month, her doctor reported that some progress was being made and plaintiff left the session in good spirits. (Tr. 2757). However, one week later plaintiff reported that her moods had been "nasty," her sleep was erratic, and her appetite was good. (Tr. 2756). In December 2015, plaintiff presented with a "fair" mood. (Tr. 2753-54). When next seen eight months later in August 2016, plaintiff was tearful and talkative and displayed good eye contact. (Tr. 2752). She displayed no significant changes when seen in September, October and November 2016. (Tr. 2749-2751). When seen by Dr. Raji in January 2017, plaintiff continued to endorse symptoms of depression and irritability. However, her mental status examination was normal. (Tr. 2747). The following month, Dr. Raji noted plaintiff had minimal response to her medication and adjusted her medication. (Tr. 2746). Her mental status exam was again normal. (Tr. 2745). Dr. Raji reported in March 2017 that plaintiff was doing well on her current regimen, and her mood was stabilized. (Tr. 2743). Her mental status exam was assessed as normal. (Tr. 2743). In April

2017, her therapist reported a normal mental status exam with the exception of pressured speech. (Tr. 2741). In May and June 2017, Dr. Raji reported normal mental status examinations and that plaintiff was doing well on her current regimen. (Tr. 2737, 2740). Plaintiff also saw Dr. Ripley in May 2017. On mental status exam, plaintiff's mood was calm, "sad," and "happy," her affect was labile, her behavior was compliant and impulsive, and her thought process was circumstantial. (Tr. 2736). Dr. Ripley reported that plaintiff was teary, then happy, then teary, and they discussed parenting issues. (*Id*.). In June 2017, plaintiff was seen again by Dr. Ripley, who reported that on mental status exam plaintiff's mood was calm, happy, and positive, her affect was labile, congruent, and mild, her behavior was cooperative and compliant, and her thought process was appropriate. (Tr. 2735). When last seen by Dr. Ripley on July 19, 2017, plaintiff reported being "really overwhelmed and frustrated," she had "lots of hormonal challenges," and she found herself "more short tempered." (Tr. 2734). On mental status examination, plaintiff's mood was sad, frustrated, irritable, and tired, her affect was labile, her behavior was cooperative and compliant, and her thought process was rigid. (*Id*.).

Plaintiff does not dispute the ALJ's finding that plaintiff's mental status examinations were largely normal, with the exception of a few exams. The mental status examinations and treatment notes of Dr. Bernardon and the Cleveland Clinic providers, as well as plaintiff's providers at Professional Psychiatric Services, are substantial evidence supporting the ALJ's determination that Drs. Raji and Ripley's opinion of plaintiff's more extreme limitations – that plaintiff would be off task for 75 to 100% of the workday and would miss four days or more per month – was inconsistent with the overall record. The ALJ also reasonably determined that these

limitations were inconsistent with plaintiff's daily activities, which included taking care of her pets and son, driving to school and sporting events, shopping, preparing meals, performing some yardwork and cleaning, and doing laundry. (Tr. 24, citing Tr. 228-31, 249-51, 2467). For these same reasons, the ALJ's weighing of Dr. Johnson's consultative opinion is substantially supported by the record. The ALJ reasonably determined that the opinions of Drs. Raji, Ripley, and Johnson were inconsistent with the overall record, including plaintiff's mental status examinations, conservative treatment, and activities of daily living. The ALJ provided valid reasons which are substantially supported by the evidence for giving only little weight to these mental health providers' opinions. The ALJ's decision must be affirmed where, as here, it is supported by substantial evidence regardless of whether the reviewing court could disagree on whether the individual was disabled, or substantial evidence could also support a contrary result. *See, e.g., Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *see also Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) ("If substantial evidence supports the Commissioner's decision, this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.") (internal quotation marks omitted). This assignment of error is overruled.

**IT IS THEREFORE ORDERED THAT**:

The decision of the Commissioner is AFFIRMED, and this matter is closed on the docket of the Court.

Date: ___3/30/20_____                         ___*s/Karen L. Litkovitz*_____
                                                 Karen L. Litkovitz
                                                 United States Magistrate Judge